IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2021

## MELVIN JACKSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for McNairy County**
**No. 3830A     J. Weber McCraw, Judge**

---

### No. W2020-00387-CCA-R3-PC

---

The petitioner, Melvin Jackson, appeals the denial of his petition for post-conviction relief, which petition challenged his McNairy County Circuit Court guilty-pleaded convictions of aggravated robbery and unlawful possession of a weapon by a convicted felon, arguing that he was deprived of the effective assistance of counsel. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

J. Colin Rosser, Somerville, Tennessee, for the appellant, Melvin Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Lisa Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The McNairy County Grand Jury charged the petitioner with the attempted first degree murder of Amy Taylor, the aggravated robbery of Caelin Roberts, the aggravated assault of Ms. Taylor, and the unlawful possession of a firearm by a convicted felon in connection with the robbery of the Milledgeville Shell Station. Pursuant to a plea agreement with the State, the petitioner pleaded guilty to the aggravated robbery and firearm charges in exchange for concurrent sentences of 12 years and dismissal of the remaining charges.

The State submitted the following stipulation of facts at the plea submission hearing:

[I]f this matter had gone to trial, the State would be able to show that on September 17th of 2017, the McNairy County Sheriff's Office was called to 6947 Highway 22 North, Milledgeville, which is located in McNairy County at a Shell station. At approximately 7:43 p.m. a black male later identified as the [petitioner] entered the store with a handgun and demanded money from the register. The [petitioner] can be seen and heard pointing the handgun at the clerk and pulling the trigger and demanding money. The subject fled out of the east door nearest to the diesel pumps and got into a dark colored SUV sitting at the post office and the car left traveling in the direction of Saltillo. Later we learned that the driver of the SUV was, in fact, his girlfriend, the co-defendant . . . who has already pled in this matter to her parts of this. [The co-defendant] was apprehended first and was interviewed by Lieutenant Johnson at the McNairy County Justice Center. . . . [She] did give a written statement that [the petitioner] did make her travel to Milledgeville, Tennessee, for the purpose of robbing the Shell station and that [the petitioner] did go into the Shell station with a silver handgun. [She] stated he returned with money and got approximately five hundred and sixty dollars from the station.

Trial counsel informed the trial court that the petitioner was "before the Court today to enter a best interest plea. He does believe that it is in his best interest to resolve this matter pursuant to the agreement as indicated in the plea papers."

At the February 10, 2020 evidentiary hearing, trial counsel, an assistant district public defender, testified that he was appointed to represent the petitioner at the general sessions court level. Trial counsel said that he met with the petitioner, who was incarcerated in another county while this case was pending, when he was brought to McNairy County for court appearances. During those meetings, counsel reviewed the discovery materials with the petitioner, including the statements of the eyewitnesses and the video surveillance recording that captured the offense. Trial counsel testified that he informed the petitioner that the petitioner qualified as a multiple offender based upon his criminal history and apprised him of the potential penalties should he be convicted at trial.

Trial counsel recalled that "[t]here was really no identification issue or nothing of that nature" in the petitioner's case and that "there were several witnesses, to include his girlfriend, who had identified him as the perpetrator." Counsel said that he told

the petitioner that his girlfriend planned to testify against him and that the petitioner's "primary concern throughout all of our meetings was that he did not want his girlfriend to be put on the stand to testify so he gave me the authority at all costs to reach an agreement to resolve it." As a result, trial counsel proceeded quickly to negotiate an agreement with the State.

Trial counsel testified that he "saw no need to" request a forensic evaluation in this case because the petitioner "seemed clear to me in understanding what I was telling him." Counsel said that he discussed the nature of the charges with the petitioner as well as the terms of the State's plea offer. He recalled that the petitioner "may have indicated to me that his ability to read was somewhat limited," so trial counsel "went over those documents with him to make sure that he was clear in his understanding." Counsel said that, based upon his experience and "dealing with him, I had no reason, didn't then and neither do I have now any reason to believe that [the petitioner] didn't understand what he was doing."

During cross-examination, trial counsel testified that, although he did not "recall specifically providing [the petitioner] with a copy of it," he did discuss "the discovery [materials] with him to include the statements of the victims." Counsel could not recall whether he had shown the video surveillance recording to the petitioner but could "recall showing him all the documents that I had." He said that he did not view the video surveillance recording until the preliminary hearing because the State was under no obligation to provide it to him before then. Trial counsel testified that he told the petitioner "that the State didn't even need the video" because "they had the two clerks that were in the store that were able to identify him" and "his girlfriend who drove him to the place that was able to identify him." Trial counsel said that he did not request a change of venue because, other than some "media" "upon the initial arrest in this matter," "there was no other display of media in this area regarding this incident."

The petitioner testified that trial counsel did not visit him "when I was in Memphis before I got to prison at Bledsoe." He said that, when he first met with trial counsel, he told counsel that "based on what I had studied at 201 that some of the charges should be dismissed, and he was like he didn't think so." The petitioner recalled that he insisted on a preliminary hearing even after trial counsel suggested that he waive it. The petitioner complained that counsel was unaware of the video surveillance recording prior to the preliminary hearing, "which made me believe that he didn't investigate the case or know anything going on with the case." The petitioner testified that he did not receive "a discovery pack," that he did not understand the evidence the State intended to use against him, and that he believed that "some of the charges [were] going to be dismissed before indictment." The petitioner said that, given that "there's too many holes in the case," he did not believe that trial counsel "did the best that he could." The petitioner said that he

-3-

asked trial counsel, "[C]ould I answer under the *Alford* plea and he asked [the prosecutor] and she said there was no problem but on my judgment sheet I don't see no recognition of it."

During cross-examination, the petitioner said that "[t]he outcome of the case could have been different if" trial counsel "would have studied and he would have investigated the case by saying that a lot of stuff wasn't credible and that there was an ID issue." He asserted that counsel could have "at least asked me if I had an alibi or seeing if I was there or where I was at or if I knew anything." He said that, even though the two victims from inside the store and his girlfriend identified him as the perpetrator, "there's contradictions there" that counsel could have explored.

The petitioner testified that he could not specifically recall the trial court's asking him if he was entering his guilty pleas voluntarily but said, "I guess that's a standard question so, yes." He did, however, recall the trial court's informing him of the rights that he was waiving by pleading guilty and his telling the trial court that he understood.

During redirect examination, the petitioner said that it was his understanding that he would be entering an *Alford* plea but that the judgment forms do not indicate that he did so. He claimed that "[i]t would have made a lot of difference" because he no longer trusted trial counsel and "didn't know of any process to take to remove him as my attorney."

Upon questioning by the court, the petitioner acknowledged that he told the trial court during the plea colloquy that he was satisfied with trial counsel's performance "[b]ecause at the time I thought it was in my best interest what he was doing."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In the written order denying post-conviction relief, the court found that the petitioner "actually understood the significance and consequences of the particular decision to plea[d] guilty and the decision was not coerced." The court found that the petitioner "was fully aware of the direct consequences of the plea, including the possibility of the sentence actually received." The court accredited trial counsel's testimony that he met with the petitioner, that the two discussed the discovery materials, that he informed the petitioner of the potential sentences he faced if convicted as charged, and that the petitioner appeared to understand the nature of the charges as well as the potential punishments.

In this appeal, the petitioner reiterates his claim that he was deprived of the effective assistance of counsel.

We view the petitioner's claim with a few well-settled principles in mind.

-4-

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing

the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001); *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In the context of a guilty plea, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process" by establishing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

In our view, the post-conviction court did not err by denying relief. Trial counsel's accredited testimony established that he reviewed the discovery materials with the petitioner and that he told the petitioner that the two victims and the petitioner's girlfriend intended to identify the petitioner as the perpetrator if the case went to trial. Although the petitioner argued that counsel should have investigated the case more, he did not present any evidence that trial counsel would have uncovered with more investigation. Similarly, despite his claim that an issue existed with regard to his identity as the perpetrator, the petitioner failed to present any evidence to undermine the statements of the two victims and the co-defendant identifying him as the perpetrator.

The petitioner also claims on appeal that he believed that he was entering an "*Alford* or no contest plea; however, the judgment sheets in the record are marked as a guilty plea." An *Alford* plea is, in fact, a guilty plea and not a plea of no contest. In *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), the United States Supreme Court held that a criminal defendant may enter a guilty plea without admitting guilt if the defendant intelligently concludes that his best interests would be served by a plea of guilty. The transcript of the guilty plea submission hearing clearly indicates that the petitioner entered his pleas because he believed the plea agreement to be in his best interests. Stated another way, the petitioner entered an *Alford* plea. Certainly, nothing in the record suggests that, but for the alleged errors of his counsel, the petitioner would not have pleaded guilty and would have, instead, insisted upon going to trial.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE